NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0509n.06

Case No. 23-1285

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

ERIC BROWN and ROY THORNE, )
individually and as next friend of S.T., a )
minor, )
　　　 )
　　Plaintiffs - Appellants, )
　　 )
v. )
　　 )
CITY OF WYOMING, et al., )
　　 )
　　Defendants - Appellees. )
　　 )

**FILED**
Dec 09, 2024
KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MICHIGAN

OPINION

Before: GIBBONS, BUSH, and LARSEN, Circuit Judges.

The court delivered a PER CURIAM opinion. GIBBONS, J. (pp. 22–26), delivered a separate opinion dissenting in part.

PER CURIAM. Eric Brown, Roy Thorne, and Thorne's minor son, S.T., were wrongfully arrested by Wyoming Police Department ("WPD") officers during a scheduled showing of a for-sale house. A neighbor called police when she saw an African American man waiting outside the house on a Sunday afternoon. The man was Eric Brown, a real estate agent, but the neighbor mistook him for someone who had been arrested the week before for unlawfully entering the house. Logan Wieber, the officer who made the original arrest, responded to the neighbor's call. He arrived at the house with three other officers. The officers drew their firearms and took cover, and Wieber commanded those inside the house to exit with their hands up. As the three walked out, Wieber realized that the person he had arrested a week ago was not among them. Nonetheless, Wieber proceeded to arrest Brown. Meanwhile, another officer aimed his firearm at Thorne and S.T. as they exited the house.

No. 23-1285, *Brown v. City of Wyoming*

During his arrest, Thorne told the officers that he and his son were touring the house with their realtor.  The officers verified Brown's identity and confirmed that the group was lawfully in the house but only after each plaintiff was handcuffed or placed in the back of a police cruiser.  A few minutes later, the officers released them, apologized, and left the scene.

Brown, Thorne, and S.T. sued the arresting officers and the city of Wyoming under 42 U.S.C. § 1983.  The district court granted summary judgment for defendants.  Plaintiffs now appeal.  For the reasons outlined below, we reverse in part.

I.

In July 2021, Wieber responded to an alleged residential trespassing in Wyoming, Michigan.  A homeowner called the police after his neighbor had informed him that a "small, Black gentleman" had parked a black Mercedes in his driveway for a few days and later entered the home's unlocked breezeway.  When Wieber arrived at the address, the homeowner was waiting on the curb and the Mercedes was backed into the driveway.  The homeowner did not know whether the vehicle's owner was inside the house.  The homeowner informed Wieber that, because the house was vacant and listed for sale, "the only people that are allowed in there [are] people [who] want to buy it."  7/24 Body Cam, 1:10–:18, 3:28–:35, 6:44–:49.  The homeowner then informed Wieber that he "just talked to the realtor," who showed the house twice that day, and that the realtor noticed nothing unusual at the residence.  *Id.* at 2:10–:17.  Wieber offered to enter the house and search for trespassers, the homeowner agreed, and Wieber radioed for another officer to help in the endeavor.

While waiting for backup, Wieber noticed a man sitting on the porch of the vacant house.  Wieber called out to the man, ushered him to the front yard, and questioned him about his connection to the property.  The man said that he was interested in buying the house and mentioned

No. 23-1285, *Brown v. City of Wyoming*

that he owned the Mercedes.  The man then volunteered that he discovered that the front door was unlocked and that he went inside the house to look around.  After confirming that the man had entered the house, Wieber placed him in handcuffs, patted him down, finding no contraband, and put him in the back of the police cruiser.  Wieber then approached the Mercedes and recorded its license plate information.  By then, Wieber's backup arrived on the scene and Wieber debriefed him on the situation.  The officers cleared the house and confirmed that nobody else was inside before driving the man to the station, impounding the Mercedes, and citing him with unlawful entry.

About a week later, Brown scheduled a showing of that same residence to a potential buyer, Roy Thorne, and his minor son, S.T., in the early afternoon.  Brown arrived at the home around 2:00 p.m., parked his black Hyundai Genesis on the curb, made small talk with the neighbors, and waited for the buyer to appear.  Shortly afterward, Thorne and S.T. drove up in a charcoal grey Chevy Malibu.  They parked behind Brown's Genesis and then entered the house to start the showing.

Meanwhile, one of the homeowner's neighbors called the police.  The neighbor told police that the "young Black man that was [] squatting in [the] home that's for sale . . . [was] back there again."  8/1 Call, 00:17–:31.  She reported that "the black Mercedes is sitting right outside of the home" and that the "guy is sitting in it" now.  *Id.* at 00:54–1:02.  Dispatch relayed the information to the WPD.  Wieber recognized the address and the original incident and responded to the call. While driving to the scene, Wieber called the neighbor to confirm that she was "positive that it was the same subject as before or if there was any chance that it was anything different[.]"  DE 46-2 Wieber Dep., PageID 1216.  The neighbor affirmed her prior description, noted that two other Black males had arrived at the address, and stated that all three had just entered the home.  Wieber

No. 23-1285, *Brown v. City of Wyoming*

relayed this information to other officers, describing the upcoming encounter as a possible breaking and entering.

Officer Devin Quintard was the first to arrive on the scene. As he pulled up to the address, he noticed the Genesis and Malibu parked in front of the house and conveyed the license plate numbers to dispatch. As he finished, Wieber entered the scene and parked behind the Malibu. Next on the scene were officers Zachery Jackson, who parked behind Wieber, and Arrow Kotark, who was nearest Quintard.

With four officers in place, the group engaged. Quintard ventured along the south side of the house, into the backyard. Kotark covered him and remained in the southeast corner near a tree in the front yard. Jackson and Wieber stayed by their cars, and Wieber started to shout, commanding anyone inside the house to exit with their hands in the air. Each officer had his firearm drawn, and Jackson aimed his at the front door of the house.

About ninety seconds after the first command, Thorne, Brown, and S.T. appeared in the open hallway behind the storm door. Despite realizing that the person he arrested a week ago was not among the three individuals in the house, Wieber continued with his commands. Thorne was the first to exit and, following his instructions, walked towards Wieber. As Wieber started to handcuff him, S.T. and Brown walked onto the porch and waited with their hands raised. Wieber proceeded to tell Thorne why he was being detained. In response, Thorne told Wieber that Brown was a realtor showing him and his son the house. Wieber did not inquire further, however, and placed Thorne in the back of his police cruiser. Wieber then instructed Brown to approach in the same fashion as Thorne. When Brown reached the officers, Officer Russell Kamstra, who arrived at the scene just before Thorne was placed in the back of a cruiser, proceeded to handcuff Brown.

No. 23-1285, *Brown v. City of Wyoming*

Finally, Wieber called for S.T. to step down from the porch and come towards the officers.  Jackson then walked up to S.T. and handcuffed him before leading him into the back of a patrol car.

As Jackson detained S.T., Brown identified himself as a realtor and invited Kamstra to search his wallet for his license.  Kamstra then walked Brown to the front door so that Brown could show him how he accessed the home using a realtor-specific phone application.  With this information, Kamstra uncuffed Brown and notified the other officers to do the same for Thorne and S.T.  After Brown, Thorne, and S.T. were released, the officers apologized and left the scene.

Brown, Thorne, and S.T. sued the officers and the city of Wyoming, asserting several constitutional and state-law claims.  The city and the individual officers moved for summary judgment.  The district court granted both motions, and plaintiffs appealed.

## II.

We review a district court grant of summary judgment de novo.  *Equitable Life Assurance Soc'y v. Poe*, 143 F.3d 1013, 1015 (6th Cir. 1998).  Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute over a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 565 (6th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)).  We must view all facts, and make all inferences, in the light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.

Plaintiffs sued the City of Wyoming and the officers involved in their detention under 42 U.S.C. § 1983.  They contend that the officers violated their clearly established constitutional

No. 23-1285, *Brown v. City of Wyoming*

rights to be free from unlawful detention, excessive force, and discriminatory policing. They also argue that the city failed to properly train its officers with respect to various constitutional principles and later ratified unconstitutional behavior when it refused to discipline any of the officers involved and issued a press release denying wrongdoing. We address these issues in turn, starting with the officers' liability.

A. Officers' Liability: Qualified Immunity

Qualified immunity shields law enforcement officers from civil liability under § 1983 unless their actions infringed clearly established statutory or constitutional rights of which a reasonable person would have known. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam). A right is clearly established when, "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing" is unlawful. *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quotations omitted). Although our caselaw must give a reasonable officer fair warning "of what the Constitution requires," *Ashcroft v. al-Kidd*, 563 U.S. 731, 746 (2011), it need not present "the exact same fact pattern" as the challenged conduct. *Brown v. Chapman*, 814 F.3d 447, 461 (6th Cir. 2016) (citation omitted).

At the summary judgment stage, we must determine whether, viewing the evidence in the light most favorable to the plaintiffs, (1) the officers violated a constitutional right, and (2) the right was clearly established. *Kovacic v. Cuyahoga Dep't of Child. & Fam. Servs.*, 724 F.3d 687, 695 (6th Cir. 2013).

No. 23-1285, *Brown v. City of Wyoming*

1.  Unreasonable Detention

Plaintiffs argue that WPD officers violated their Fourth Amendment right to be free from arrest[1] unsupported by probable cause.  They claim that any probable cause of a crime created from the neighbor's 911 call dissipated after the officers arrived on scene and recognized that none of the three plaintiffs were involved in the July arrest at that residence.  The district court granted defendant officers' motion for summary judgment, based on qualified immunity, explaining that plaintiffs failed both to prove that the alleged right was clearly established at the time of the event and that a constitutional violation had occurred.  We disagree.

a.  Constitutional Violation

We first address whether the officers violated plaintiffs' constitutional rights under these circumstances.  The Fourth Amendment guarantees the right "to be secure . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.  "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed."  *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).  The existence of probable cause depends on "the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."  *Id.*  An officer has probable cause when he has "reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that the [individual] had committed or was committing an offense."  *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000) (first alteration in original) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).  The account of an eyewitness "will constitute sufficient probable cause unless, at the time

---

[1] Plaintiffs, defendant officers, and the district court all analyze this detention as if it were an arrest. Based on these concessions, we review the issue under the same standard.  We note, however, that being handcuffed or placed into the back of a police car does not always amount to an arrest.  *See, e.g.*, *Brown v. Lewis*, 779 F.3d 401, 415 (6th Cir. 2015); *United States v. Rogers*, 861 F. App'x 8, 14 (6th Cir. 2021).

No. 23-1285, *Brown v. City of Wyoming*

of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation." *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999) (citation omitted).

Plaintiffs argue that the officers did not have probable cause for arrest because the eyewitness's statement, the only information supporting probable cause, was critically flawed and unreliable. The district court broke up the inquiry by officer, but ultimately found that no constitutional violation occurred. Although correct in part, the district court erred in assessing the actions of Officer Wieber.

i. Officer Wieber

In evaluating whether the officers committed a constitutional violation, Wieber stands apart from the other officers. Because Wieber had arrested the suspect at the residence in July 2021, he had the information necessary to verify the neighbor's claim during the August call. A reasonable juror could conclude that Wieber acted unreasonably and violated plaintiffs' rights in arresting them without probable cause.

Wieber likely had probable cause to make an arrest when dispatch first relayed the neighbor's call. At that point, Wieber believed that the same "young, Black man" driving a "black Mercedes" that he arrested a week prior at the Sharron Avenue address was "back there again." The neighbor confirmed these details when Wieber called her directly, and she added that two other Black males arrived at the scene and that all three entered the house. After the call, Wieber had no reason "to believe that the eyewitness was lying, did not accurately describe what [she] had seen, or was in some fashion mistaken regarding [her] recollection." *Ahlers*, 188 F.3d at 370 (internal quotation marks omitted).

No. 23-1285, *Brown v. City of Wyoming*

Wieber's probable cause for arrest started to erode as he approached the house. Although he testified that he did not verify the make and model of the vehicles parked on the street, the black Mercedes that the neighbor described was absent from the scene. Officer Quintard also relayed the information about the vehicles parked outside the address to the officers before Wieber arrived on the scene—meaning the officers knew about the vehicle discrepancy before the arrest-related events unfolded.

But the bigger issue arose when plaintiffs responded to Wieber's commands and appeared in front of the doorway. When plaintiffs became visible, Wieber testified that he "did not recognize any of them as the subject from before" that he arrested. DE 45-2, Wieber Dep., PageID 826. In that moment, Wieber's probable cause evaporated. The neighbor had told Wieber that the prior suspect had entered the house with two other people. Now all three were outside the home, and the prior suspect was not one of them. At that time, Wieber either realized or should have realized that the neighbor's call, the only foundation for probable cause, was "not accurate . . . or was in some fashion mistaken." *Ahlers*, 188 F.3d at 370 (cleaned up). There was no longer a basis for arrest. *See Ouza v. City of Dearborn Heights*, 969 F.3d 265, 282 (6th Cir. 2020) ("Stated in positive terms, *Ahlers* established that a person has a right to be free from arrest based solely on an eyewitness account that is in some way untruthful or unreliable.").

In his deposition, Wieber explained that, despite this revelation, he continued with plaintiffs' arrest because "our call for dispatch was still that somebody was at the residence unlawfully." DE 45-2, Wieber Dep., PageID 827. But there are several flaws with that reasoning. First, as mentioned, Wieber had confirmed with the neighbor that three people had entered the house together; and he watched three people exit. Second, the neighbor's report was specific. She alleged that the *same* suspect that the police arrested a week ago was back again. Even if she did

No. 23-1285, *Brown v. City of Wyoming*

make a broad claim of illegal entry, it would have been unreasonable for Wieber to rely on that assertion as probable cause for arrest because she reported no signs of forced entry, was not the property owner, and could not attest to whether a person was lawfully at the residence.  Third, neither Wieber nor any officer on the scene contacted the owner of the property beforehand to confirm whether someone had a right to be on the property at that time.  Wieber also knew that the house was for sale when he arrested the first suspect, that it was still for sale when he responded to this call, and that the realtor was showing the house to interested buyers.  With this knowledge, and without affirmative notice from the property owner or real estate agency that people should not be on the property, Wieber could not assume that the people were at the residence unlawfully.[2]

In sum, a reasonable juror could conclude that Wieber lacked probable cause to arrest plaintiffs and, as a result, committed a constitutional violation.

ii.    Officers Quintard, Jackson, Kortark, Kamstra, and Look

Plaintiffs argue that officers Quintard, Jackson, Kortark, Kamstra, and Look also participated in the unlawful arrest and thus violated their constitutional rights.

Beginning with Look, he arrived on the scene after plaintiffs were arrested.  Look did not participate in plaintiffs' detention, and because officers cannot be held responsible for the unlawful behaviors of others, he cannot be liable.  *See Aspey v. Chester Township*, 608 F. App'x 335, 339 (6th Cir. 2015).

As for the remaining officers, they relied on the information from both the neighbor's call and Wieber's comments to conduct the arrests.  With no independent knowledge about the first

---

[2] Under these facts, and because he knew that the property owner was not among the group, Wieber could have conducted a *Terry* stop to find out plaintiffs' purpose for being at the property—like he did for the July incident—but the parties agree that he arrested plaintiffs instead.  *See Gardenhire*, 205 F.3d at 317.

arrest, these officers had no reason to doubt Wieber's actions or the partially reliable information expressed by the neighbor. *See United States v. Hensely*, 469 U.S. 221, 231 (1985). Considering the information that they had at the time, these officers had probable cause to arrest plaintiffs. As a result, these officers did not violate plaintiffs' constitutional rights.

b. Clearly Established

Having determined that Officer Wieber violated plaintiffs' constitutional rights, we must next address whether the rights were clearly established. This court has addressed whether an eyewitness's account establishes probable cause on several occasions. In *Ahlers*, for example, we determined that an alleged victim's statement reporting sexual assault, standing alone, was sufficient to establish probable cause. *Id.* at 370–71. The alleged victim was interviewed three times regarding her allegations; each time, her story was consistent. *Id.* at 367. At the same time, we recognized that genuine issues of fact regarding probable cause might exist when "eyewitness identification [is] in some way untruthful or unreliable." *Id.* at 371. Our precedent has treated *Ahlers* as establishing that an individual "has a right to be free from arrest based solely on an eyewitness account that is in some way untruthful or unreliable" absent further corroboration. *Ouza*, 969 F.3d at 282, 284. *Ouza* recognized the need to define the relevant right with sufficient specificity, particularly in the Fourth Amendment context. *See id.* at 280–81. Even so, we determined that the right was narrow enough to give the officer fair warning that his arrest was unlawful. *Id.* at 284.

Our precedent holds that it was clearly established that an officer may not arrest an individual based solely on an eyewitness account that is untruthful or unreliable. That is exactly what happened here when Officer Wieber learned that the prior trespasser had not returned to the

No. 23-1285, *Brown v. City of Wyoming*

house as the neighbor stated but proceeded to arrest plaintiffs anyway.  Wieber's actions violated plaintiffs' clearly established constitutional rights.

2.  Excessive Force

Next, plaintiffs argue that the officers violated their Fourth Amendment protections in using excessive force during the arrest.    Plaintiffs' contention hinges on the claim that "[d]efendants were not free to point their firearms at plaintiffs absent a single factor that indicated that force was necessary or proper."  CA6 R. 16, Brown Br., 35–36.  They also allege that officers who were on the scene but did not brandish a firearm are still liable for failing to intervene.  The district court granted the officers' motion for summary judgment on qualified immunity grounds, reasoning that plaintiffs did not demonstrate that the right was clearly established and that they failed to show a constitutional violation.[3]  We agree that the officers are entitled to qualified immunity.

The Fourth Amendment's prohibition against unreasonable seizures protects citizens from law enforcement's excessive use of force.  *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Cass v. City of Dayton*, 770 F.3d 368, 374 (6th Cir. 2014).  In making an arrest, however, an officer may "use some degree of physical coercion or threat."  *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001) (quoting *Graham*, 490 U.S. at 396).  In determining whether an officer used excessive force, we ask whether the officer's actions were "objectively reasonable" in light of the facts and circumstances confronting him.  *Graham*, 490 U.S. at 397.  This is an objective inquiry; the officer's "underlying intent or motivation" is irrelevant.  *Id.*  In considering the totality of the

---

[3] The district court also analyzed a claim for excessive force related to handcuffing.  Plaintiffs did not address this claim in either their response to defendants' summary judgment motion or in their brief before this court.  We will not consider an argument that plaintiffs fail to raise before us.

circumstances, we place a particular emphasis on three factors: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (quoting *Graham*, 490 U.S. at 396).

A law enforcement officer uses force against another when he or she aims a firearm at an individual. *See Kent v. Oakland County*, 810 F.3d 384, 394 (6th Cir. 2016). We have explained that "pointing a firearm at an individual and making a demand of that individual" is an "implicit threat that if the individual does not comply," the person pointing the firearm "will shoot." *Vanderhoef v. Dixon*, 938 F.3d 271, 277 (6th Cir. 2019) (citation omitted). Whether this force is reasonable, as the balancing test above suggests, depends largely on the facts of the encounter. *See Binay v. Bettendorf*, 601 F.3d 640, 649–50 (6th Cir. 2010).

Plaintiffs argue that officers Wieber, Kotarak, Jackson, and Quintard each engaged in excessive force by using their firearms. The district court found otherwise. We agree with the district court.

i.   Officers Wieber, Kotark, and Quintard

The testimony and body camera footage show that officers Wieber and Quintard did not point their firearms at plaintiffs. Wieber drew his firearm, but kept it to his side, and pointed at the ground, as he commanded plaintiffs to exit the house. (DE 46-2, Wieber Dep., PageID 1218; 8/1 Wieber Dash Cam.) Quintard, likewise, drew his firearm but approached the back of the house and did not return to the scene of the arrest until the other officers started to release Thorne. (DE 40-14, Quintard Dep., PageID 527–29; Quintard BWC 1:40–7:30.) These actions did not amount to force against plaintiffs.

No. 23-1285, *Brown v. City of Wyoming*

Kotark, who was stationed at the southeast end of the house's front yard, momentarily pointed his firearm at Thorne through a window. At some point after plaintiffs noticed the police, but before they exited the house, Thorne tried to get Kotark's attention. (DE 45-3 Thorne, Dep., at PageID 844–45.) To do so, Thorne yelled "officer" a few times through a closed window and threw his hands in the air. (*Id.* at 845; DE 40-21, Kortark Dep., PageID 689–70.) Thorne claims that, in response, Kortark, who had his firearm aimed at the ground, pointed it up towards him. (DE 45-3 Thorne, Dep., at PageID 845.) Thorne then ducked down. Although Kortark momentarily pointed his gun at Thorne, this was a defensive reaction for his own safety. And in reacting to stimuli, "police officers are often forced to make split-second judgments' about the amount of force necessary 'in circumstances that are tense, uncertain, and rapidly evolving." *Raimey v. City of Niles*, 77 F.4th 441, 448 (6th Cir. 2023) (citation omitted). Kortark's actions were not unreasonable in context.

ii.  Officer Jackson

Unlike the other officers, Jackson, standing next to a patrol car and far from the house, aimed his firearm at the front door of the house and at plaintiffs. Jackson did not lower his firearm until Wieber had handcuffed Thorne. Reviewing the body camera footage, Jackson appears to point his firearm at Thorne for less than three minutes, as Thorne, following Wieber's commands, turned his back to the officers and walked backwards towards them, hands in the air, to facilitate his own handcuffing.

We need not decide whether Jackson violated plaintiffs' constitutional rights by training his gun on them because, regardless, he didn't violate their clearly established rights. *See Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015) (noting that the court may consider either prong first). The Supreme Court has recognized, especially in the Fourth Amendment excessive-

No. 23-1285, *Brown v. City of Wyoming*

force context, that "the clearly established law must be particularized to the facts of the case." *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam) (citation omitted). Plaintiffs bear "the burden of showing that a right was clearly established." *Barton v. Martin*, 949 F.3d 938, 950 (6th Cir. 2020). That generally requires plaintiffs to "identify a case where an officer acting under similar circumstances as Officer [Jackson] was held to have violated the Fourth Amendment." *White*, 580 U.S. at 79. Here, plaintiffs offer two cases as support for the conclusion that their rights were clearly established—*Binay v. Bettendorf*, 601 F.3d 640 (6th Cir. 2010), and *Vanderhoef v. Dixon*, 938 F.3d 271 (6th Cir. 2019). Both, however, are distinguishable.

In *Binay*, the panel affirmed the denial of qualified immunity for officers who, in the process of carrying out a search warrant, ordered three compliant family members to the ground at gunpoint, handcuffed them, and maintained their detention at gunpoint until the search was completed. 601 F.3d at 644. The court held that the use of force was unreasonable because "[p]laintiffs had no criminal record, cooperated throughout the ordeal, posed no immediate threat to the officers, and did not resist arrest or attempt to flee, all of which are factors that tend to weigh against [d]efendants' contentions regarding the amount of force that was appropriate." *Id.* at 650. The court determined that plaintiffs' lack of resistance and the absence of any immediate threat to the officers outweighed the serious nature of the crime, drug trafficking, and held that the amount of force used was excessive. *Id.*

*Binay*, however, doesn't present a factual scenario remotely similar to the instant case. For starters, the officers in *Binay* held the family members at gunpoint even though they were handcuffed the entire time. Here, Jackson pointed his gun at Thorne only until he was handcuffed. He didn't point it at plaintiffs again after that. Also in *Binay*, the officers held "[p]laintiffs at gunpoint and [kept] them handcuffed throughout the *hour long ordeal*." *Id.* at 648 (emphasis

No. 23-1285, *Brown v. City of Wyoming*

added). Here, Jackson trained his weapon at the house or plaintiffs for under three minutes. Put simply, the facts in *Binay* do nothing to inform Jackson that his conduct violated plaintiffs' constitutional rights.

In *Vanderhoef v. Dixon*, 938 F.3d 271 (6th Cir. 2019), we reversed a grant of qualified immunity where a plain-clothes officer held three occupants of a wrecked vehicle at gunpoint for about two minutes after he witnessed the accident and their reckless driving. *Id.* at 274–75, 279. The court in *Vanderhoef* held that "a plain-clothes officer may not hold at gunpoint an unarmed citizen suspected of a mere traffic violation." *Id.* at 279. The court concluded that the officer "should have known that pointing his gun at plaintiff—a nonfleeing teenager whom he did not reasonably suspect of any prior crime beyond speeding and reckless driving—and holding him at gunpoint for roughly two minutes, violated plaintiff's Fourth Amendment rights." *Id.* at 281.

*Vanderhoef* is distinguishable. Crucial to the court's analysis in *Vanderhoef* was that the suspected crime at issue was nothing more than reckless driving. *Id.* Here, however, the officers were responding to a potential felony breaking and entering. We have recognized that felonious breaking and entering is a "crime[] of notable severity" for purposes of the *Graham* factors. *Crawford v. Geiger*, 656 F. App'x 190, 207 (6th Cir. 2016). And we must consider Jackson's actions only in light of the facts knowable to him. *White*, 580 U.S. at 76–77. Jackson didn't know what Wieber understood as the plaintiffs exited the house—that the prior offender was not one of the three people on the porch. Instead, for all Jackson knew, the prior offender had again broken into the house but this time had brought two accomplices. Accordingly, *Vanderhoef* is not sufficiently on point to put Jackson on notice that he was violating plaintiffs' constitutional rights.

Jackson's involvement was limited. He briefly trained his weapon on plaintiffs to protect himself and his fellow officers, who were responding to a potential felony breaking and entering.

No. 23-1285, *Brown v. City of Wyoming*

After Thorne was handcuffed and it became apparent that there might have been a mistake, Jackson holstered his weapon. Plaintiffs' proffered caselaw does not make clear that "every reasonable officer" in Jackson's shoes "would have understood that what he was doing violates" a constitutional right. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation omitted). As a result, Jackson is entitled to qualified immunity.

Plaintiffs also allege that at least some officers can be held liable for failing to intervene in another's use of excessive force. Liability can attach under this theory "when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).

Plaintiffs' argument is unpersuasive. They argue that Wieber, Jackson, Kortark, and Quintard engaged in excessive force on the scene in using their firearms. Conceptually, these officers could not intervene when they themselves used the force that plaintiffs now point to as unreasonable. Only two officers, Look and Kamstra, did not unholster a firearm during the incident. But Look arrived after plaintiffs were detained, and Kamstra had no reason to believe that the force used was excessive, as he was on the scene for only a few seconds while Jackson had his weapon drawn and had limited information when he arrived at the address. As a result, Look and Kamstra cannot be liable under this claim.

3. Equal Protection

Finally, plaintiffs argue that the officers violated their right to be free from discriminatory treatment under the Fourteenth Amendment's Equal Protection Clause when the officers arrested them "on the basis of their race" alone. CA6 R. 16, Brown Br., 37. The district court, however, found that plaintiffs failed to overcome either prong of the qualified immunity analysis.

No. 23-1285, *Brown v. City of Wyoming*

Even if the right was clearly established, plaintiffs' claim fails because they did not show that a constitutional violation occurred. To succeed on their equal protection claim, plaintiffs must prove "that the challenged police action 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *Bennett v. City of Eastpointe*, 410 F.3d 810, 818 (6th Cir. 2005) (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). A plaintiff can show a discriminatory effect by providing evidence that similarly situated individuals of another race were treated differently—either by identifying an individual of another race whom the officers treated differently or through statistical proof. *See King v. City of Eastpointe*, 86 F. App'x, 790, 802 (6th Cir. 2003) (citing *United States v. Armstrong*, 517 U.S. 456, 465 (1996)). A plaintiff must also "prove that the decisionmakers in *his* case acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987).

Here, however, plaintiffs offered no evidence of discrimination. They merely reiterated their belief that they were wrongfully arrested and targeted because of their race. That cannot by itself create a genuine issue of material fact. *See Bey v. Falk*, 946 F.3d 304, 321 (6th Cir. 2019) ("[T]hat a stop violated the Fourth Amendment may be one factor in determining whether race motivated the stop; but it is not alone sufficient."). Rather than providing evidence to support that claim, plaintiffs argue, without citation to any authority, that the officers have "the burden of showing that there are no genuine issues of material fact relating to" the equal protection claim and "to explain what, *other than the Plaintiffs' race*," led to their arrest. CA6 R. 16, Brown Br., 30. But it was the plaintiffs' burden to proffer evidence of discriminatory effect and purpose, not the officers'. *See Bey*, 946 F.3d at 319. Because plaintiffs failed to meet their burden, the officers are entitled to qualified immunity on the equal protection claim.

No. 23-1285, *Brown v. City of Wyoming*

B. Municipal Liability

Plaintiffs also asserted a § 1983 claim against the city of Wyoming. They argue that the city is liable under § 1983 for two reasons: (1) it failed to train its officers on constitutional principles, and (2) it ratified the officers' unconstitutional behavior by not disciplining them after an investigation and instead issuing a press release denying any misconduct. The district court granted the city's summary judgment motion on both claims.

The city is not automatically liable under § 1983 for its employees' civil rights violations. *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978). But it may be liable when its employees' conduct was committed under an "official policy" such that its promulgation or exercise can be said to have "cause[d]" the employee to violate an individual's constitutional rights. *Id.* at 692. An official policy might be based on (1) the city's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citing *Monell*, 436 U.S. at 694). Plaintiffs invoke two of these avenues—failure-to-train and ratification of unconstitutional conduct—but neither has merit.

Plaintiffs first argue that the city had a policy of inadequate training. To succeed on this claim, plaintiffs must show "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). "Deliberate indifference 'is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Shadrick v. Hopkins County*, 805 F.3d 724, 737 (6th Cir. 2015)

No. 23-1285, *Brown v. City of Wyoming*

(quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)). To show deliberate indifference, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Brown*, 520 U.S. at 409.) Because of this, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* at 61

Plaintiffs contend that the city "never trained" its officers on "constitutional principles," which led to their use of excessive force and plaintiffs' unlawful detention. CA6 R. 16, Brown Br., 38–39. But plaintiffs provided no evidence to support this claim. The city, by contrast, put forward a detailed training log for each involved officer to suggest their competence. The officers participated in various use of force, de-escalation, bias awareness, and duty-to-intervene trainings. Nor do plaintiffs argue that the city's alleged failure to train was borne out of its deliberate indifference. They do not point to a pattern of constitutional violations within WPD or suggest that the city omitted obvious and foreseeably necessary training. *See Brown*, 520 U.S. at 409; *Connick*, 563 U.S.at 63–64. Absent these threads of analysis, plaintiffs' failure-to-train argument falls short.

Plaintiffs also argue that the city ratified unconstitutional behavior when it chose not to discipline the officers after investigation and, in response to public outcry about the encounter, issued a press release disclaiming any wrongdoing. "A plaintiff can establish municipal liability by showing that the municipality ratifies the unconstitutional acts of its employees by failing to meaningfully investigate and punish allegations of unconstitutional conduct." *Wright v. City of Euclid*, 962 F.3d 852, 882 (6th Cir. 2020). "Ratification may take the form of a failure to investigate, provided there have been 'multiple earlier inadequate investigations [that] concern

No. 23-1285, *Brown v. City of Wyoming*

comparable claims.'"  *Mosier v. Evans*, 90 F.4th 541, 549 (6th Cir. 2024) (citing *Pineda v. Hamilton County*, 977 F.3d 483, 495 (6th Cir. 2020)).  A single instance of failing to investigate cannot give rise to a municipal liability claim for ratification because it fails to establish causation.  *See Pineda*, 977 F.3d at 495.  Because ratification of the investigation underlying a plaintiff's *present* claim necessarily post-dates the alleged injury, the ratification cannot have *caused* the plaintiff's injury.  *See id.*

Plaintiffs fail to allege that the WPD has a history of ratifying flawed investigations or failing to discipline officers.  Instead, they focus entirely on the investigation and press release related to *their* arrest and present claim.  Thus, without more, plaintiffs' ratification argument fails as a matter of law.

Because plaintiffs' failure-to-train and ratification arguments lack merit, the city is entitled to summary judgment on the municipal liability claim.

IV.

For the reasons stated above, we reverse the district court's ruling on the unlawful detention claim against Officer Wieber; otherwise, we affirm.

No. 23-1285, *Brown v. City of Wyoming*

JULIA SMITH GIBBONS, Circuit Judge, concurring in part and dissenting in part.  In my view, Officer Jackson violated clearly established law when he pointed his gun at plaintiffs as they exited the house with their hands raised.  I therefore respectfully dissent from the portion of the majority opinion holding that Jackson is entitled to qualified immunity on plaintiffs' excessive force claim.

To overcome qualified immunity, plaintiffs must show that the evidence, when viewed in the light most favorable to them, would allow a reasonable juror to find that (1) Jackson violated their constitutional rights, and (2) those rights were clearly established.  *Kovacic v. Cuyahoga Dep't of Child. & Fam. Servs.*, 724 F.3d 687, 695 (6th Cir. 2013).

Plaintiffs argue that Jackson violated their constitutional rights by using excessive force. The Fourth Amendment guarantees the right to be free from unreasonable seizures, which includes an officer's use of excessive force.  U.S. Const. amend. IV; *see Vanderhoef v. Dixon*, 938 F.3d 271, 276 (6th Cir. 2019).  In determining whether an officer's force was excessive, we balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quotation marks and citation omitted).  It is an objective inquiry, focusing on whether the officer's actions were "objectively reasonable" based on the circumstances confronting him.  *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (citing *Graham*, 490 U.S. at 388).  Three factors guide our analysis: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight.  *Graham*, 490 U.S. at 396.

As to the nature and quality of the intrusion, Jackson's actions were extreme.  *Id.*; *see Vanderhoef*, 938 F.3d at 277.  Unlike the other officers, Jackson pointed his gun at the front of the

- 22 -

No. 23-1285, *Brown v. City of Wyoming*

house (before plaintiffs exited) or at plaintiffs for most of the encounter.  At one point, he appeared to point his gun at Thorne while Thorne walked backwards out of the house and with his hands raised.  Jackson did not lower his gun until Officer Wieber handcuffed Thorne.

By pointing his gun at plaintiffs and demanding that they exit the house, Jackson conveyed the "implicit threat" that if plaintiffs do not comply with his demands, he "will shoot" them.  *Id.* (citing *United States v. Bolden*, 479 F.3d 455, 461 (6th Cir. 2007)).  Jackson's actions therefore amounted to a "credible threat of deadly force," which remained in effect for the roughly three minutes he kept his gun raised.  *Vanderhoef*, 938 F.3d at 277.  Whether this force was reasonable, as the balancing test above suggests, depends largely on the facts of the encounter.  *See Binay v. Bettendorf*, 601 F.3d 640, 649 (6th Cir. 2010).

Turning to the first *Graham* factor, the severity of the crime weighs in plaintiffs' favor. Jackson understood that dispatch relayed a neighbor's call alleging a possible trespassing and that, on further detail from Wieber, the event was elevated to a possible breaking and entering.  The majority emphasizes that breaking and entering a house is a potential felony in Michigan.  Maj. Op. at 16; *see Crawford v. Geiger*, 656 F. App'x 190, 207 (6th 2016) (describing felonious breaking and entering as a crime of "notable severity" for purposes of the *Graham* factors).  It is true that some, but not all, breaking and entering offenses are felonies.  *See* Mich. Comp. Laws § 750.115.  But even if the suspected crime were a felony, surely not every DUI, theft, drug possession, or other nonviolent felony justifies pointing a gun at a suspect.  The question is not whether *any* use of force was justified but whether *Jackson's* use of force—here, a credible threat of deadly force—was justified.  *Martin,* 712 F.3d at 958.

The second *Graham* factor—whether plaintiffs posed an immediate threat to the officers' or public's safety—also weighs in plaintiffs' favor.  When the officers responded to the 911 call,

No. 23-1285, *Brown v. City of Wyoming*

they knew that the house was vacant and for sale, making the potential for a violent encounter unlikely.  There were also no reports that plaintiffs were armed or otherwise dangerous.  To be sure, when Jackson arrived at the scene, plaintiffs were still inside the house.  Because he could not determine whether plaintiffs were armed, Jackson raised his gun and aimed it at the front door.  But once plaintiffs exited the house with their hands raised, the risk of danger all but subsided.  At that point, Jackson and the other officers could see that plaintiffs were not holding any dangerous or threatening weapons.  That Jackson was the only officer to keep his gun raised while plaintiffs exited the house is further support that plaintiffs posed no immediate threat to the officer's or public's safety.

Lastly, plaintiffs fully complied with the officers' demands.  Following Wieber's orders, plaintiffs walked out of the house, one by one, with their hands in the air.  They then submitted themselves to arrest.

Thus, viewing the evidence in the light most favorable to plaintiffs, as we must at this stage, a reasonable juror could conclude that Jackson acted unreasonably and with excessive force when he pointed his firearm at plaintiffs.

It is not enough, however, to show that Jackson violated plaintiffs' constitutional rights.  Plaintiffs must also show that the rights violated were clearly established.  A right is clearly established when, "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful."  *D.C. v. Wesby*, 583 U.S. 48, 63 (2018) (quotation marks and citation omitted).  Although our caselaw must give a reasonable officer fair warning that the conduct at issue was unconstitutional, *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011), it need not present "the exact same fact pattern, or even 'fundamentally

No. 23-1285, *Brown v. City of Wyoming*

similar' or 'materially similar' facts." *Brown v. Chapman*, 814 F.3d 447, 461 (6th Cir. 2016) (citation omitted).

This court has repeatedly held that an officer's use of force in pointing a gun can be excessive. In *Binay v Bettendorf,* we held that an officer violated clearly established law by pointing a gun at an individual who "had no criminal record, cooperated throughout the ordeal, posed no immediate threat to the officers, and did not resist arrest or attempt to flee." 601 F.3d at 650. The majority reasons that *Binay* is distinguishable because, in that case, the officers held plaintiffs at gunpoint for about an hour. *See id.* at 648 ("Defendants continued to hold Plaintiffs at gunpoint and keep them handcuffed throughout the hour long ordeal."). Jackson pointed his gun at the house or at plaintiffs for about three minutes.

But how long a suspect is held at gunpoint is not a dispositive factor under our caselaw. A few minutes may, in some cases, suffice. For example, in *Vanderhoef v. Dixon*, a plain clothes officer held at gunpoint an individual suspected of reckless driving for about two minutes. 938 F.3d at 274–75. Despite the short interaction, we held that the officer violated clearly established law. *Id.* at 279–80. The majority dismisses *Vanderhoef* as a case involving "nothing more than reckless driving." Maj. Op. at 16. But the plaintiff's reckless driving in *Vanderhoef* was hardly minor. The arresting officer saw the plaintiff, driving well-above the speed limit, swerve into the officer's oncoming lane of traffic. 938 F.3d at 274. The plaintiff then drove across the officer's lane and into a ditch on the ride of road, striking a telephone pole, before swerving back across the road. *Id.* Jackson, by contrast, did not observe plaintiffs commit any crime; all he had were second-hand reports that plaintiffs possibly engaged in a trespassing or breaking and entering offense. Thus, considering the plaintiff's actual conduct in *Vanderhoef* and the officer's

No. 23-1285, *Brown v. City of Wyoming*

first-hand observations, it is hard to see how plaintiffs' conduct here (even as reported to Jackson) could be more serious.

In *Wright v. City of Euclid*, this court once again addressed the issue of excessive force in the context of firearm pointing. 962 F.3d 852 (6th Cir. 2020). There, plain clothes officers approached Wright in his car and drew their guns on suspicion that he took part in a drug transaction. *Id.* at 860–61. The officers did not witness any transaction but assumed Wright was involved based on the residence he was seen leaving. *Id.* at 861. This court held that "it was clearly established as of the time of Wright's encounter with the officers that brandishing a firearm without a justifiable fear that Wright was fleeing or dangerous was unreasonable and constituted excessive force." *Id.* at 870.

Given this court's precedent—as set forth in *Binay*, *Vanderhoef*, and *Wright*—Jackson was on notice that pointing his firearm at plaintiffs as they walked out of the for-sale house with their hands raised violated clearly established law. It was clearly established at the time of plaintiffs' encounter with Jackson that pointing a gun without a justifiable fear that plaintiffs were fleeing or dangerous was unreasonable and constituted excessive force. For this reason, I believe that the district court erred in granting qualified immunity to Jackson on the excessive force claim.